2025 IL App (1st) 232247-U

No. 1-23-2247

Order filed February 13, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 MC 1194542 |
| | ) | |
| EDWIN LOPEZ MIRANDA, | ) | Honorable |
| | ) | Donald Panarese, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Lampkin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for criminal trespass to a residence is affirmed over his contentions that the State failed to prove him guilty beyond a reasonable doubt and that his trial counsel was ineffective for failing to move for a directed finding.

¶ 2    Following a bench trial, defendant Edwin Lopez Miranda was found guilty of criminal trespass to a residence (720 ILCS 5/19-4(a)(1) (West 2022)) and sentenced to three months' supervision. On appeal, Miranda contends that the State failed to prove beyond a reasonable doubt that he knew that he lacked authority to enter the apartment at issue. In the alternative, Miranda

contends that his trial counsel was ineffective for failing to move for a directed finding at the close of the State's case.[1] For the reasons that follow, we affirm.[2]

¶ 3                                                    I. BACKGROUND

¶ 4      Miranda was charged by misdemeanor complaint with one count of criminal trespass to a residence following an incident on December 27, 2022.

¶ 5      At Miranda's first court appearance on March 29, 2023, Miranda informed the court that he spoke Spanish. The court asked Miranda if he needed an interpreter, and Miranda answered, "Yes, please." The court stated that it would call an interpreter and passed the case. When the case was recalled, the court swore in an interpreter, who then translated that day's proceedings. Trial commenced on July 26, 2023, with a Spanish interpreter present.

¶ 6      Elaine Barker testified that she lived alone in a fourth-floor apartment in Chicago. Around December 2022, she noticed a few things in her residence that were out of the ordinary. First, she found a t-shirt under her air conditioning unit, clogging a leak. Because she was "hyper allergenic" and particular about her clothing, she would not have placed the t-shirt there. Second, mints she kept near her front door "kind of disappeared." Third, one day she came home and found her front door locked with its dead bolt, which she would never do herself. After making these observations, Barker installed a security camera inside her apartment, directed at her front door. The camera began recording when triggered by movement or sound.

---

[1]Although the parties use the term "motion for a directed verdict," when such a motion is made at a bench trial, it is more properly referred to as a "motion for a directed finding," a "motion for an acquittal," or a "motion for a finding of not guilty." See *People v. Connolly*, 322 Ill. App. 3d 905, 914 (2001). In this case, we refer to the motion as a "motion for a directed finding."

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7    Around 3 p.m. on December 27, 2022, Barker left her apartment to run errands, locking her door behind her. As she exited the building, she saw Miranda in an apartment, the front door of which was open, across the hall and two doors down. Barker knew Miranda as the maintenance person for her building, as Miranda had done apartment repairs for her in the past. Barker and Miranda had a brief conversation, which she described as follows:

"A. He said that he, liked, [*sic*] lived in 101. He asked me what apartment I lived in and I pointed to my door and I said I lived right there. He remembered doing a work order for me before. I thanked him for doing it. That was about the extent of our conversation. Then I left.

Q. Were the keys mentioned at all in this interaction?

A. Yeah. So, I asked him, like, you know, what he does and he mentioned that he cleans all of the apartments in the building. He cleans, like, a lot of them in the area, so he has access to all of those things. I'm like, hey, is it just you that does all that, and he's like, yeah, it's just me."

¶ 8    Following the conversation, Barker left the building. While she was out, she received a "notice indication" from her security camera that someone was in her apartment. She checked the camera's footage through her Google Home application and saw footage of Miranda opening her door at approximately 3:50 p.m.

¶ 9    A 14-second video clip of footage captured by Barker's camera was published in court. Barker testified that it depicted Miranda opening her door, walking into her apartment, "gasping a little, then closing the door." The video depicts the inside of Barker's front door. For approximately the first seven seconds of the video, the camera captures the sound of one or more locks turning while the door is closed. At the seven-second mark, the door opens approximately half-way.

Miranda is visible in the doorway with his right hand on the outer doorknob and his left hand at the bolt, which is approximately shoulder-height. With his mouth open, Miranda looks into the apartment, in the general direction of the camera. At the nine-second mark, there is a breathy sound, and then Miranda immediately closes the door.

¶ 10    Barker testified that, on December 27, 2022, she did not give her landlord permission to let Miranda or anyone else into her apartment, and she had received no notice that anyone was coming to her apartment. Nothing needed to be fixed, she had put in no work orders, and she had not given Miranda a key or permission to enter her residence. She stated, "There's no reason for anyone to be in my apartment."

¶ 11    On cross-examination, Barker agreed that, when she talked to Miranda on the day in question, they spoke about work he had done in her apartment. She acknowledged in court that she was grateful for the work he had done and agreed that she had given him a cash tip. During their conversation, he asked where she lived and she pointed to her apartment. She knew that he spoke multiple languages but denied that their conversation was "somewhat in English and somewhat in Spanish," as she does not speak Spanish. She stated, "[T]he entire conversation that we had was very understandable. He understood me. I understood him."

¶ 12    On further cross-examination, Barker testified that she had not spoken to the property manager about her unit on December 27, 2022. However, she was unsure if she had spoken to him about anything else that day. When asked whether, during the previous occasion when Miranda worked in her apartment, she knew the property manager had given him a key, Barker answered that she "was unsure what the exact setup was." When she would "talk to maintenance," sometimes the building manager would send Miranda or someone else to address her concern. She did not know who gave Miranda access to the keys.

¶ 13    On redirect examination, Barker stated that, to the best of her knowledge, Miranda was an agent of her landlord. She did not give the landlord permission for Miranda to enter her apartment on December 27, 2022, and did not personally give Miranda permission to enter.

¶ 14    Miranda testified through an interpreter that on the date in question, he was employed as a maintenance worker for the building. His responsibilities included general cleaning and repairs in apartments. When asked whether, as part of his job, the property manager gave him keys to access different units, he answered, "Yes, I was authorized."

¶ 15    About two weeks prior to December 27, 2022, Miranda had performed some work in Barker's apartment. Specifically, he installed two screws because her window was loose and he "brought down" an air conditioning unit. He was not given a work order for that job; rather, the "one in charge" called him and told him to go to Barker's apartment.

¶ 16    On December 27, 2022, Miranda was painting in a fourth-floor apartment when Barker knocked on the door. She began talking to him in English, and he told her he could not understand much of what she was saying. In court, he stated that he speaks some English, but "[n]ot well, a little bit. Only a few words." When asked whether he understood a few words here and there, he answered, "A little, but it's hard for me to understand."

¶ 17    Miranda recognized some of the words Barker was using. He testified, "I understood that she said that because I had set two screws, that her apartment was hot." Barker gave him a $13 tip and pointed out her apartment, which was also on the fourth floor. Miranda described what happened next:

> "She said that her apartment was too hot, and because she spoke in English, I did
>
> not understand. So, then I wanted to go and remove one of the screws so her apartment

wouldn't be so hot. And then when I noticed that I didn't remember her apartment very well, when she pointed out, then I went back to do my job."

¶ 18    Miranda specified that he went to the apartment he thought Barker pointed at and knocked on the door. He unlocked and opened the door, "saw that that was not the apartment," and went back to painting. When asked if he thought the apartment was the one he was supposed to enter, he answered, "I was not sure, that's why I didn't want to go in." He agreed that he used keys his boss had provided him to open the door, saying, "I was authorized with the keys." He also agreed that he left after he realized it was the wrong apartment.

¶ 19    On cross-examination, Miranda denied that he saw Barker leaving her apartment. The following dialogue ensued:

"Q. Ms. Barker never gave you permission to enter her apartment?

A. I did not understand it because she spoke in English.

THE COURT: Let the record reflect the defendant has been answering in English to English questions from his attorney. Go ahead.

[DEFENSE COUNSEL]: They've been translated by madam interpreter.

THE COURT: Oh, no. He's been answering your questions in English, your questions. Oh, yes, oh, yes. Go ahead.

BY [ASSISTANT STATE'S ATTORNEY]:

Q. My question for you is that you entered her apartment without her permission, not that you misunderstood her?

A. (Speaking Spanish).

[DEFENSE COUNSEL]: Objection. It was a yes or no question.

THE COURT: Overruled. He may answer.

THE WITNESS: No.

[ASSISTANT STATE'S ATTORNEY]: Could we translate what he said?

THE INTERPRETER: I cannot—I cannot do it because he was just going on and on and I was waiting for somebody to direct him.

BY [ASSISTANT STATE'S ATTORNEY]:

Q. You did not have permission to enter this apartment?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

THE WITNESS: No.

[ASSISTANT STATE'S ATTORNEY]: Your Honor, no further questions of this witness."

¶ 20    On redirect examination, Miranda agreed that, during his conversation with Barker, she spoke in English. He stated that he understood only "some words" that she said.

¶ 21    On re-cross examination, he agreed that he did not have a work order from the landlord to enter the apartment, explaining, "[t]hey would not give me orders. *** When I get the orders, the job orders, he would only call." He agreed that his boss did not call him to enter the apartment on the day in question.

¶ 22    Finally, Miranda reiterated that he does not speak English but could understand "a little from school." He denied that he could understand his attorney, stating, "All the time, I use an interpreter."

¶ 23    In closing, the State reviewed Barker's testimony and highlighted the video footage. The State argued, among other things, "The defendant knowingly entered the apartment. Even if there was a miscommunication, mistake is not an excuse for trespassing to a residence. And even if

there's still a misunderstanding, the defendant clearly entered the apartment knowingly and without permission from Ms. Barker."

¶ 24    Defense counsel began his closing by remarking that the State was arguing there was a misunderstanding. The court interjected, "There's no misunderstanding. [Miranda] testified he had no authority to enter this place." Counsel continued, asserting that the State had not met its burden of proving that Miranda had knowledge that he did not have authority. In rebuttal, the State asserted that it had met its burden.

¶ 25    The trial court found Miranda guilty, stating, in total, "The defendant testified he had [*sic*] not have authority. Not only was [Miranda] not truthful with this Court, he lied. The State has met their burden to find him guilty."

¶ 26    Miranda filed a motion to reconsider and for a new trial, arguing, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt. Miranda also contended that the trial court erred in finding that he testified without the use of the interpreter in response to his attorney's questions, which were in English, "and that such testimony constituted a lie or misrepresentation to the court."

¶ 27    At the hearing on the motion, Miranda called Demeris Ramos, the trial interpreter. Counsel asked Ramos whether she remembered Miranda responding in English to his attorney's questions. Ramos answered that she did not.

¶ 28    Counsel argued that the State failed to prove Miranda's guilt beyond a reasonable doubt where the evidence supported a reasonable hypothesis that he did not know his entry into the apartment was without Barker's authority. Counsel further claimed that the court's finding that Miranda lied during cross-examination was not borne out by the record. The court responded:

"Okay. I'm not saying that he lied because he understood English versus Spanish. I'm questioning his truthfulness during his testimony. Just because—just because the testimony was that he understands some English because Miss Parker [*sic*] testified that she spoke to him in English and he understood some according to her."

¶ 29 Following this statement, counsel resumed his argument that the State did not disprove the reasonable hypothesis that Miranda believed Barker asked him to undo some of his prior work in her apartment because the unit had become too hot. In response, the State reviewed portions of the trial testimony and argued Miranda was proven guilty beyond a reasonable doubt.

¶ 30 The trial court denied Miranda's motion, explaining:

"Well, Miss Parker [*sic*] wouldn't have been able to explain to [Miranda] her apartment was hot because she does not speak Spanish. So for him to understand or believe that he had authority to go into that apartment, when [the State] asked him, point blank: You did not have permission to enter this apartment. His answer was no. And he testified when I get the orders, the job orders, he would only call. Your boss did not call you to enter this apartment on the day in question? No. Do you speak English? No. Do you understand English? No.

And he said he understands a little from school. I mean, and then he testifies that Miss Parker [*sic*] needed two screws adjusted on December 27th, I am correct, December 27 because it was hot.

[Defense counsel], try as you may, and you have done a great job, your motion is denied."

¶ 31 The trial court subsequently sentenced Miranda to three months' supervision. Miranda filed a timely notice of appeal.

¶ 32                                    II. ANALYSIS

¶ 33     Miranda first challenges the sufficiency of the evidence to sustain his conviction.

¶ 34     When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "A reviewing court must allow all reasonable inferences from the record in favor of the State" (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)), and the positive and credible testimony of a single witness is sufficient to convict (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)).

¶ 35     It is the trier of fact's responsibility to determine the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts in the evidence, and to draw reasonable inferences from the evidence, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Gray*, 2017 IL 120958, ¶ 35. Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt (*People v. Slim*, 127 Ill. 2d 302, 307 (1989)) or where proof of an element of a crime is wholly lacking (*People v. Sweigart*, 2021 IL App (2d) 180543, ¶ 56).

¶ 36     As charged, a person commits criminal trespass to a residence "when, without authority, he or she knowingly enters or remains within any residence *** that is the dwelling place of another." 720 ILCS 5/19-4(a)(1) (West 2022).

¶ 37     In this court, Miranda does not contest that he entered Barker's residence or that he was without authority to do so. He only contends that the State failed to prove beyond a reasonable doubt that he knew he lacked authority to enter the apartment.

¶ 38    A defendant enters the dwelling place of another "without authority" when the occupant has not granted him consent to enter. *People v. Witherspoon*, 2019 IL 123092, ¶ 25. In *Witherspoon*, which involved a home invasion statute with nearly identical language to the statute at issue here, our supreme court held that the "without authority" element must include the mental state of knowledge. *Id.* ¶ 31. In general, knowledge refers to an awareness of the existence of the facts which make a person's conduct unlawful. *Id.* ¶ 33. By statute, a person acts knowingly when, *inter alia*, he is consciously aware of the nature of his conduct. See 720 ILCS 5/4-5(a) (West 2022). In addition, "[k]nowledge of a material fact includes awareness of the substantial probability that the fact exists." *Id.*

¶ 39    Knowledge is often proven by circumstantial evidence because it is the mental element of an offense and, as such, is rarely proven by direct evidence. *People v. Leib*, 2022 IL 126645, ¶ 37. Whether a defendant had the requisite mental state to support his conviction is a question for the trier of fact that will not be disturbed on review unless a reasonable doubt exists as to the defendant's guilt. *People v. Maggette*, 195 Ill. 2d 336, 354 (2001).

¶ 40    Miranda contends that the State failed to prove that he knew he lacked authority to enter Barker's apartment, since she spoke to him about his prior repair work, gave him cash, and pointed to her unit. He argues that he does not speak English well, that his job allowed him to enter apartments to make repairs and clean, and that the property manager had given him keys to do so. Given these circumstances, he argues that nothing suggested he knew he lacked authority to enter Barker's apartment and nothing demonstrated that the situation differed from any other work he had performed in tenants' units.

¶ 41    Miranda acknowledges that he did not receive a work order in this instance. However, he asserts that it is of no moment, as he never testified that his employer only told him to enter a unit

after receiving a work order. Moreover, he maintains that, based on his conversation with Barker, he reasonably believed that there was something inside her apartment that she wanted him to repair, so he believed that she was allowing him to enter. He acknowledges Barker's testimony that she did not give him permission to enter but argues that Barker's testimony did not establish that he understood her.

¶ 42 After reviewing the evidence in the light most favorable to the State, we conclude that the circumstances under which Miranda entered Barker's apartment were sufficient for the trial court to conclude that Miranda knew he lacked authority to do so.

¶ 43 First, as mentioned, Miranda concedes that he did not receive a work order authorizing him to enter the apartment. Barker testified that when she spoke to Miranda on the day in question, their conversation was not "somewhat in English and somewhat in Spanish," as she did not speak Spanish. She stated that they understood each other during their entire conversation. Miranda told her, among other things, which apartment he lived in, that he had completed a work order for her before, and that he cleaned apartments in the building. She thanked him for his prior work and gave him a cash tip. After Miranda asked where she lived, she pointed to her unit.

¶ 44 Second, the video footage depicts Miranda opening Barker's front door halfway and looking into the unit, in the general direction of the camera. Following a breathy sound, Miranda immediately closes the door.

¶ 45 Viewing the evidence in the light most favorable to, and taking all reasonable inferences in favor of, the State, this evidence was sufficient for the trial court to conclude that Miranda knew he was entering Barker's residence without authority. Stated differently, we are unable to say it would be impossible for any rational trier of fact to find the elements of criminal trespass to a residence to be proven beyond a reasonable doubt.

¶ 46 In reaching this conclusion, we are not persuaded by Miranda's argument that his conversation with Barker would have led him to reasonably believe that she wanted a repair made inside her apartment and, therefore, believe that she was allowing him to enter. While this conclusion is not outside the realm of possibility, Miranda's argument harkens back to the obsolete "reasonable hypothesis of innocence" standard. Under that standard, the trier of fact was required to exclude every reasonable hypothesis of innocence before finding a defendant guilty in cases involving circumstantial evidence. See, *e.g.*, *People v. Branion*, 47 Ill. 2d 70, 77 (1970). However, the reasonable hypothesis of innocence standard of review is no longer viable in Illinois; rather, the reasonable doubt test, as set forth above, applies in reviewing the sufficiency of the evidence in all criminal cases. *People v. Pintos*, 133 Ill. 2d 286, 291 (1989); *People v. Walker*, 2020 IL App (4th) 180774, ¶¶ 82-83.

¶ 47 It is well-settled that the testimony of a single witness, if positive and credible, is sufficient to convict. *Siguenza-Brito*, 235 Ill. 2d at 228. Here, Barker's testimony is not the only evidence that belies Miranda's theory. In addition to her testimony, the video footage depicts behavior that is not consistent with a person who believed he had just been granted authority by a tenant to enter her apartment to make some sort of repair. The footage shows Miranda unlocking and opening Barker's front door. Instead of continuing inside the unit to assess whether any work is necessary, Miranda takes a two-second glance through the half-open door and immediately closes it. We agree with the State that Miranda's quick retreat supports a determination that he knowingly entered the apartment without authorization. We reject Miranda's argument that no reasonable fact finder could conclude that he knew he lacked authority to enter Barker's apartment. His challenge to the sufficiency of the evidence fails.

¶ 48    Miranda next contends that his trial counsel was ineffective for failing to move for a directed finding after the State failed to prove in its case-in-chief. He argues that Barker's testimony failed to demonstrate that, beyond Barker granting direct permission to enter, there were no other means that authorized him to enter the apartment or that he did not enter while performing his work duties. As such, he asserts, it was objectively unreasonable for trial counsel to have failed to move for a directed finding at the close of the State's case. He maintains that he was prejudiced by counsel's failure because (1) there was a reasonable probability that he would have been acquitted at that point, and (2) counsel called Miranda to testify, which allowed the State to use his testimony to support their theory that he lacked authority and knew it.

¶ 49    Claims of ineffectiveness are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984). To establish a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. More specifically, a defendant must demonstrate that his counsel's performance was objectively unreasonable under prevailing professional norms (*id.* at 694), overcome a "strong presumption" that counsel's alleged error was part of a "sound trial strategy" (*People v. Houston*, 226 Ill. 2d 135, 144 (2007)), and establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Strickland*, 466 U.S. at 694).

¶ 50    In reviewing claims of ineffective assistance, appellate courts "use a bifurcated standard of review, wherein we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel's actions support an ineffective assistance claim." *People v. Nowicki*, 385 Ill. App. 3d 53,

81 (2008). In this case, where Miranda's challenge does not involve findings of fact made by the trial court, we consider *de novo* whether Miranda has stated a claim for ineffective assistance of counsel. See *People v. Ortega*, 2020 IL App (1st) 162516, ¶ 24. A reviewing court need not address both prongs of the *Strickland* inquiry if the defendant makes an insufficient showing as to one prong. *Strickland*, 466 U.S. at 697.

¶ 51     We find that Miranda has failed to establish the prejudice prong of *Strickland* where there is not a reasonable probability that, had counsel moved for a directed finding, such a motion would have been granted.

¶ 52     A motion for a directed finding or verdict asserts that, as a matter of law, the State's evidence is insufficient to support a finding or verdict of guilty. *Connolly*, 322 Ill. App. 3d at 915. When ruling on such a motion, the trial court does not pass upon the weight of the evidence or the credibility of the witnesses and must consider the State's evidence in the light most favorable to the State. *Id.* "In other words, a motion for a directed verdict of not guilty asks whether the State's evidence *could support* a verdict of guilty beyond a reasonable doubt, not whether the evidence *does in fact support* that verdict." (Emphases in original.) *Id.*

¶ 53     Here, the State presented evidence both that Miranda lacked authority to enter Barker's apartment and that he knew he lacked that authority. Barker testified that, on the day in question, she did not give her landlord permission to let Miranda or anyone else into her apartment. She further testified that nothing in her unit needed repair, she had put in no work orders, and she had not personally given Miranda a key or permission to enter her residence.

¶ 54     Miranda argues that landlords have independent authority to enter premises for repairs and maintenance, which does not hinge on a tenant's permission. Miranda therefore submits that his employer, the property manager, could have authorized him to enter Barker's apartment, and the

State presented no evidence to rebut that possibility. However, Barker testified that nothing in her apartment needed to be fixed. Barker testified that she "was unsure what the exact setup was" between the property manager and Miranda, but noted that when she needed a repair, she would "talk to maintenance." In response, sometimes the property manager would send Miranda or someone else to address her concern, instead of taking care of it himself. We agree with the State that this testimony provided some evidence that, for Miranda to gain authorization via the property manager to enter Barker's apartment, the initial communication had to have come from her.

¶ 55    Regarding whether Miranda knew that he lacked authority to enter, we have already determined that the State proved that element beyond a reasonable doubt based on Barker's testimony and the video evidence.

¶ 56    In summary, we find that the evidence adduced by, and viewed in the light most favorable to, the State could support a finding of guilt beyond a reasonable doubt. See *id.* at 918. As such, there is no reasonable probability that, had counsel moved for a directed finding at the close of the State's case, the motion would have been granted. Where Miranda suffered no prejudice as a result of counsel's inaction, we need not consider the performance prong of the *Strickland* test. See *Strickland*, 466 U.S. at 697.

¶ 57                                  III. CONCLUSION

¶ 58    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 59    Affirmed.